EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ana M. Argüello López, Myrna Y. López Peña          Demandantes-Recurrentes          v.  Elías Argüello García          Demandado-Recurrido | Certiorari  2001 TSPR 124  154 DPR _____ |

Número del Caso: CC-2000-366


Fecha: 31/agosto/2001


Tribunal de Circuito de Apelaciones:
                              Circuito Regional I


Panel integrado por su Presidente, Juez Rossy García, y los Jueces González Rivera y Ortiz Carrión


Abogada de la Parte Peticionaria:
                              Lcda. María de Lourdes Guzmán

Abogado de la Parte Recurrida:
                              Por Derecho Propio


Materia: Alimentos


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ana M. Argüello López,
Myrna Y. López Peña

    Demandantes-Recurrentes

        v.                      CC-2000-366     Certiorari

Elías Argüello García

    Demandado-Recurrido

Opinión del Tribunal emitida por el Juez Asociado señor FUSTER BERLINGERI

San Juan, Puerto Rico, a  31 de agosto de 2001.

Tenemos la ocasión para esclarecer y aplicar concretamente la normativa que rige en casos de alimentos cuando el alimentante alega no tener medios para pagar una pensión, a pesar de tener la capacidad para generar ingresos para ello.

I.

Mediante estipulación aprobada por el Tribunal de Primera Instancia el 18 de agosto de 1992, Elías Argüello García (Argüello), el demandado, se comprometió a pagar para el beneficio de su hija, Ana M. Argüello López (Ana), la demandante, una pensión de cuatrocientos cincuenta dólares ($450)

mensuales y cincuenta dólares ($50) adicionales para aportar al plan médico.

El 21 de septiembre de 1997 Ana cumplió la mayoría de edad, por lo que su padre solicitó al Tribunal de Primera Instancia que eliminara del caso a la madre, Myrna Yolanda López Peña (López), quien la representaba hasta ese momento. Las demandantes comparecieron para solicitar que Argüello continuara pagando la pensión alimentaria referida, más los alimentos adeudados, debido a que aunque Ana ya era mayor de edad, todavía tenía necesidad de la pensión, por ser una estudiante universitaria. En ese momento Ana cursaba su cuarto año de Bachillerato en Ciencias Ambientales a tiempo completo.

Argüello se opuso a continuar pagando toda la pensión a Ana. Alegó que carecía de recursos económicos para pagar los quinientos dólares ($500) mensuales de esa pensión debido a que alegadamente tenía otros seis hijos menores que Ana, quienes debían tener prioridad. Solicitó que se celebrara una vista evidenciaria para fijar la pensión que correspondiera, de acuerdo a sus recursos.

Así las cosas, el Tribunal de Primera Instancia, celebró una vista en los méritos el 17 de noviembre de 1998, en la cual recibió prueba oral y documental sobre las necesidades de Ana y sobre los ingresos de sus padres, para así determinar el monto final de la pensión referida, que era lo que estaba en controversia.[1]

Conforme a la prueba recibida, el tribunal de instancia determinó lo siguiente, en lo pertinente:

(1) Que Argüello trabajaba como agente de seguros y que para ello tenía licencia con respecto a cinco (5) compañías, a saber: Integrant, Universal, Triple S, National y Praico.

(2) Que Argüello poseía, además, licencia para trabajar con corredores como Colonial Insurance, a cuya compañía había sometido dos casos en 1998, en uno de los cuales ganó $600 y en el otro $1,200.

---

[1] Las partes estipularon que Ana era acreedora a una pensión alimentaria, debido a que era una estudiante sobresaliente, que había demostrado una gran aptitud y éxito en sus estudios universitarios, que había

(3) Que durante 1995 a 1998 había trabajado para Transoceanic Life, y se le habían adelantado salarios de $163,732.50, lo que equivalía a un ingreso mensual de $4,548.12.

Argüello testificó en la vista que durante los últimos dos meses, septiembre y octubre de 1998, sólo había devengado un salario de entre $600 a $700 mensuales. Pero del contrainterrogatorio surgió que éste tenía **gastos mensuales** que sumaban $2,082, a saber:

| | | |
|---|---|---|
| (1) | Colegio de tres niños que viven con él .. | $ 513. |
| (2) | Merienda para estos menores ............. | 130. |
| (3) | Teléfono, agua y luz ................... | 160. |
| (4) | Compra ................................ | 400. |
| (5) | Alimentos fuera del hogar ... .......... | 260. |
| (6) | Laundry ............................... | 130. |
| (7) | Gasolina y cambio de aceite ........... | 310. |
| (8) | Recreación ............................ | 130. |
| (9) | Cable TV y "Beeper" ................... | 49. |
| | Total . . . . | $2,082. |

**Estos gastos no incluían los pagos de varios préstamos bancarios ni de tarjetas de crédito**. Tampoco incluían el pago de una supuesta pensión alimentaria de $600 mensuales que Argüello alegó que pagaba a otros tres hijos suyos que vivían fuera de Puerto Rico, y que Argüello no pudo evidenciar.

Con arreglo a todo lo anterior, el tribunal de instancia resolvió expresamente **que no le daba credibilidad al testimonio del demandado sobre el alegado monto de sus ingresos actuales**. Para ello, el tribunal de instancia tomó en consideración que Argüello, como agente de seguros, tenía capacidad para generar ingresos mayores a los que alegadamente estaba recibiendo en la actualidad. También tomó en cuenta el historial evasivo del demandado con relación a su obligación alimentaria.

El foro de instancia en su dictamen también hizo referencia a que en el mismo mes de la vista referida Argüello había presentado una petición en la Corte de Quiebras; y que de las deudas alegadas allí, unido a los gastos mensuales y otras pensiones referidas, **Argüello tenía gastos totales en exceso de $3,755 mensuales**. Por ello, el tribunal procedió a imputarle como ingreso mínimo mensual esa misma cantidad de $3,755. De esta forma, determinó que le

comenzado siendo menor de edad. Expresamente estipularon que la controversia

correspondía pagar el 48% de los gastos mensuales de Ana, estimados en $865.25, para una aportación total de $415.32 mensuales, que Argüello debía pagarle a Ana en concepto de pensión alimenticia. En efecto, pues, el tribunal **rebajó la pensión** de $500 que era su monto anterior, a $415.32 que fue el nuevo monto fijado por el tribunal.

**Inconforme con el dictamen referido, Argüello acudió al Tribunal de Circuito de Apelaciones para impugnar la cuantía de la pensión fijada, alegando que sus otros hijos debían tener prioridad y que se debió tomar en cuenta el hecho de que Ana podía trabajar y pagar parte de sus estudios universitarios. El foro apelativo, mediante su sentencia del 14 de febrero de 2000, resolvió que la determinación del foro de instancia sobre el ingreso mínimo mensual de Argüello no se sostenía a base de la prueba presentada, por entender que dicha prueba sólo demostraba que Argüello ganaba únicamente $700 mensuales. Por tales fundamentos, le ordenó al Tribunal de Primera Instancia que fijara una nueva pensión.**

Inconforme con el dictamen referido, la peticionaria Ana acudió ante nos el 24 de abril de 2000 y señaló la comisión de los siguientes errores:

1- Erró el Tribunal de Circuito de Apelaciones al determinar que la única prueba no controvertida establece un ingreso mensual de $700, por lo cual el apelante no está en posición económica de afrontar el pago de la pensión fijada por el Tribunal de Primera Instancia, Sala Superior de San Juan.

2- Erró el Tribunal de Circuito de Apelaciones al concluir que no existe base racional que sostuviera la determinación del Tribunal de Primera Instancia, al imputar al Sr. Argüello un ingreso mínimo mensual ascendente a $3,755.

3- Erró el Tribunal de Circuito de Apelaciones al negarse a aplicar la doctrina jurisprudencial que requiere considerar la realidad de la economía subterránea existente en Puerto Rico.

4- Erró el Tribunal de Circuito de Apelaciones al sustituir el criterio del Tribunal de Primera Instancia, en ausencia de pasión, prejuicio, parcialidad o error manifiesto.

En síntesis, la peticionaria alegó que el Tribunal de Circuito de Apelaciones no había tomado en cuenta la capacidad para generar ingresos y el estilo de vida de Argüello que debían ser considerados al momento de imputarle

entre ellos era en cuanto a cuál debía ser el monto de la pensión.

ingresos, tal como lo había hecho el Tribunal de Primera Instancia. También adujo que el foro apelativo se había excedido de los límites de su facultad revisora, al intervenir con la determinación factual del foro de instancia, a pesar de que ésta no había sido producto de pasión, prejuicio, parcialidad ni error manifiesto.

El 23 de junio de 2000, en reconsideración, expedimos el recurso. El recurrido compareció el 28 de septiembre de 2000, y la peticionaria presentó su alegato el 15 de noviembre de 2000. Con el beneficio de ambas comparecencias, procedemos a resolver.

II.

Como se sabe, el derecho de los hijos a recibir alimentos, y la correlativa obligación de los padres a darlos cuando corresponda, tienen su génesis en el derecho natural, en los lazos indisolubles de solidaridad humana y de profunda responsabilidad de la persona por los hijos que trae al mundo, que son valores de la más alta jerarquía ético-moral y que constituyen una piedra angular de toda sociedad civilizada. Torres Peralta, La ley Especial de Sustento de Menores y el Derecho de Alimentos en Puerto Rico, 1997, pág. 1.1. Son, además, derechos y obligaciones que surgen del derecho constitucional a la vida. Rodríguez v. Depto. de Servicios Sociales, 132 D.P.R. 617 (1993); Negrón Rivera y Bonilla, Ex Parte, 120 D.P.R. 61 (1987); Rodríguez Avilés v. Rodríguez Beruff, 117 D.P.R. 616 (1986). Están revestidos del más alto interés público. Rodríguez v. Depto. Servicios Sociales, supra, pág. 629; Robles v. Otero de Ramos, 127 D.P.R. 911 (1991); López v. Rodríguez, 121 D.P.R. 23 (1988). Véase, además, el art. 3 de la Ley Orgánica de la Administración para el Sustento de Menores (en adelante Ley de Sustento de Menores), 8 L.P.R.A. sec. 502.[2]

---

[2] La Ley de Sustento de Menores, supra, tiene como propósito lograr que los padres o las personas legalmente responsables contribuyan, en proporción a sus recursos, al sostenimiento y bienestar de sus hijos o dependientes de acuerdo a sus necesidades, de la manera en que está consagrada tal obligación en el Código Civil. La ley propende el fortalecimiento de los sistemas y la agilización de los procedimientos administrativos y judiciales para la determinación, recaudación y distribución de las pensiones

La obligación de los padres de proveer alimentos a sus hijos tiene también varias fuentes estatutarias. Guadalupe Viera v. Morell, 115 D.P.R. 4, 14 (1983). Pero el fundamento medular de todas ellas es la relación paterno-filial. Como señalamos recientemente en Chévere v. Levis, opinión de 15 de marzo de 2000, 150 D.P.R. ___, 2000 TSPR 42, 2000 JTS 56, **[e]l derecho de los menores a reclamar alimentos, la obligación de los padres de proveerlos y la interpretación de los tribunales para concederlos deben estar enmarcados en la relación paterno-filial legalmente establecida; no supeditada a uno u otro artículo del Código Civil.**" (Énfasis en el original).

Se entiende por alimentos todo lo que es indispensable para el sustento, habitación, vestido y asistencia médica, según la posición social de la familia. Los alimentos comprenden también la educación e instrucción del alimentista, cuando es menor de edad. Artículo 142 del Código Civil, 31 L.P.R.A. sec. 561. Ello incluye tanto las necesidades físicas como intelectuales del alimentista. Viera v. Morell, 115 D.P.R. 4 (1983); Negrón Rivera y Bonilla, Ex parte, supra; Ríos Rosado v. Vidal Ramos, 134 D.P.R. 3 (1993). El concepto de educación e instrucción abarca los estudios cursados en escuela elemental, escuela superior y en la universidad o escuela vocacional. Torres Peralta, supra, pág. 1.25.

Ahora bien, no obstante la restricción en cuanto a la edad que hace el Código Civil en el referido artículo, hemos establecido ya que el deber del alimentante de proveer los medios necesarios para la educación de un hijo no termina, sin más, porque el hijo alcance la mayoría de edad. Guadalupe Viera v. Morell, supra; Key Nieves v. Oyola Nieves, 116 D.P.R. 261 (1985).[3] "Ni la emancipación ni la mayoría de edad de los hijos relevan al padre de su obligación de alimentarles si aquellos lo necesitaren." Sosa Rodríguez v. Sosa Sariego, 105 D.P.R. 518 (1976). En los casos en que el menor ha comenzado los estudios

---

alimentarias. Véase el artículo 4 de la Ley Especial para el Sustento de Menores, supra.

[3] A tales efectos, el artículo 142 del Código Civil español, equivalente al artículo 142 de nuestro código, fue enmendado con el fin de añadirle un nuevo párrafo que establece que: "la prestación de alimentos comprende también la educación e instrucción del alimentista, no sólo mientras sea menor de edad, sino aun después cuando no haya terminado su formación por

universitarios mientras es menor de edad, hemos establecido que bajo circunstancias normales:

> (...) al menos en cuanto a los estudios de bachillerato (...) cuando un hijo "se ha iniciado en un oficio o carrera durante la minoridad, tiene derecho a exigir que el alimentante le provea los medios para terminarlo, aun después de haber llegado a la mayoridad". (Citas Omitidas.) Key Nieves v. Oyola Nieves, supra, pág. 266.

Con relación a los estudios postgraduados, hemos dicho que ameritan una consideración especial y separada, que deberá resolverse caso a caso.[4] Key Nieves v. Oyola Nieves, supra, pág. 267.

Es, pues, una norma bien establecida que un tribunal puede ordenar el pago de alimentos a un hijo mayor de edad que haya comenzado sus estudios universitarios durante su minoridad y demuestre que tiene necesidad de dicha ayuda. Guadalupe Viera v. Morell, supra; Key Nieves v. Oyola Nieves, supra.

Para determinar el monto de la obligación del alimentante, hay que tomar en cuenta que en los casos en que hay más de un alimentante procede repartir entre ellos el pago de la pensión en cantidad proporcionada a su caudal respectivo. Artículo 145 del Código Civil, 31 L.P.R.A. sec. 564. El artículo 146 del Código Civil, 31 L.P.R.A. sec. 565, establece la manera de determinar el monto de la pensión: "La cuantía de los alimentos será proporcionada a los recursos del que los da y a las necesidades del que los recibe, y se reducirán o aumentarán en proporción a los recursos del primero y las necesidades del segundo." El deber de alimentar a un hijo mayor de edad está sujeto, por lo tanto, a las necesidades del alimentista y a los recursos de los alimentantes, proporcionado al caudal respectivo de cada padre.

Para determinar la capacidad económica de cada alimentante, es preciso tomar en cuenta **todos** los ingresos devengados por éste, hasta los que no aparezcan informados en la Planilla de Información Personal. Rodríguez Rosado

---

causa que no le sea imputable". Adoración Padial Albás, La obligación de alimentos entre parientes, Bosch, Barcelona, 1997, pág. 97.

[4] "[Quien] solicite 'alimentos' o asistencia económica para estudios 'postgraduados' deberá demostrar afirmativamente que es *acreedor de tal asistencia económica* mediante la *actitud demostrada* por los esfuerzos realizados, la *aptitud manifestada* para los estudios que desea proseguir a base de los resultados académicos obtenidos, y la *razonabilidad del objetivo* deseado." (Énfasis en el original.) Key Nieves v. Oyola Nieves, supra, pág. 267.

v. Zayas Martínez, 133 D.P.R. 406 (1993). El tribunal de instancia no está limitado a considerar sólo la evidencia testifical o documental sobre los ingresos. "Puede, al fijar la cuantía de la pensión, considerar aspectos tales como **el estilo de vida que lleva el alimentante**, **su capacidad para generar ingresos**, la naturaleza y cantidad de las propiedades con que cuenta, **la naturaleza de su empleo o profesión** y sus otras fuentes de ingreso." (Enfasis suplido). López v. Rodríguez, supra. En López v. Rodríguez, supra, incluso le impusimos al foro de instancia la obligación de tomar en cuenta en estos casos la realidad de la economía subterránea que prevalece en Puerto Rico. En particular, hicimos referencia a que en el país muchos profesionales y personas con negocios propios incurrían en la práctica de declarar fiscalmente sólo parte de los ingresos reales que tenían. Indicamos en ese caso que esta realidad debía tomarse en cuenta en reclamaciones sobre alimentos.[5] Por ello, expresamente indicamos que en estos casos el tribunal de instancia, tomando en cuenta toda la prueba desfilada, puede **inferir** que el alimentante cuenta con medios suficientes para cumplir con la obligación alimentaria que se le imponga. López v. Rodríguez, supra, pág. 33.

Es menester profundizar ahora en lo que señalamos someramente en López v. Rodríguez, supra. Precisamente por lo fundamental que es la obligación de los padres de alimentar a sus hijos, los tribunales en casos como el de autos tienen la responsabilidad ineludible de escudriñar la prueba que tienen ante

---

[5] "En la nota al calce número 12 de López v. Rodríguez, supra, pág. 32, señalamos, en parte, lo siguiente:

Al hacer la determinación sobre los ingresos de un alimentante también debe tomarse en consideración lo expresado en el Informe del Secretario de Hacienda sobre Reforma Contributiva de agosto de 1987, sobre la economía subterránea que prevalece en Puerto Rico:

Según el estudio de Booz-Allen & Hamilton, el total del ingreso no declarado en Puerto Rico —conocido por economía subterránea— asciende a $2,500 millones al año lo que representa un 17% del ingreso bruto personal. De este total unos $1,500 millones corresponden a personas que no declaran ingreso alguno y unos $1,000 millones a personas que declaran parte pero no todo su ingreso.

El estudio confirma además, que el mayor grado de evasión proviene de personas con negocios propios, seguidos por varios

sí, a fin de determinar la verdadera situación económica del alimentante. Particularmente en casos en los cuales el alimentante alega que no tiene ingresos suficientes o que gana menos que antes, el tribunal debe hacer todo lo posible por verificar que lo alegado por el alimentante no sea un intento por evadir su responsabilidad alimentaria.

Más aun, en los casos en que el alimentante pueda demostrar que sus ingresos han disminuido, los tribunales de instancia, al tomar en cuenta la prueba ante sí, tienen la obligación de distinguir entre las situaciones en que la reducción de ingresos ha ocurrido por razones legítimas y los casos en que la reducción ha sido deliberada o se debe a la falta de diligencia o a la dejadez del alimentante. Lo esencial es que el tribunal verifique que la reducción en los ingresos del alimentante no sea un artificio para éste incumplir con su obligación de alimentar a sus hijos adecuadamente. Tal como lo intimamos en <u>López v. Rodríguez</u>, <u>supra</u>, el foro de instancia puede tomar en cuenta el estilo de vida del alimentante, sus propiedades, su profesión y preparación académica, su historial de empleo y de ingresos, su experiencia laboral, su capacidad y aptitud para generar ingresos y otros factores similares para **<u>imputarle ingresos al alimentante razonablemente</u>**, más allá de lo que éste alegue o intente probar sobre el particular.[6] Con arreglo incluso a la prueba circunstancial que se le someta, el tribunal puede imponer una obligación alimentaria si puede inferir de esa prueba que el alimentante tiene a su alcance medios suficientes para cumplir con dicha obligación. <u>López v. Rodríguez</u>, <u>supra</u>, pág. 33.

En la labor de imputarle ingresos al alimentante como se ha señalado en el párrafo anterior, es de particular importancia que se precisen y ponderen los **gastos** en que incurre el alimentante para mantener su estilo de vida al momento cuando solicita una reducción en la pensión en cuestión. Tales gastos

---

grupos de profesionales y, finalmente, por algunos contribuyentes asalariados.

[6] Torres Peralta, <u>supra</u>, págs. 2.26 y 9.17.  Véase, a modo de ejemplo, la jurisprudencia en jurisdicciones americanas pertinente a la reducción voluntaria de ingresos:  <u>Doyle v. Doyle</u>, 646 S.2d 48 (Ala Civ. Ct. App. 1994); <u>Moore v. Tseronis</u>, 664 A. 2d 427 (Md. Ct. Spec. App. 1995); <u>In re Marriage of Salmon</u>, 519 NW 2d 94 (Iowa Ct. App. 1994); <u>Reuter v. Reuter</u>,

constituyen un elemento decisivo con respecto a la determinación de cuál es la verdadera situación económica del alimentante. Más aun, la ponderación de tales gastos puede llevar al tribunal a decidir que algunos de ellos tienen que ceder ante la obligación prioritaria de alimentar.

Al amparo de la normativa reseñada, procedamos a analizar la controversia del caso de autos.

### III.

Por estar íntimamente relacionados entre sí, discutiremos los errores señalados en conjunto. En síntesis, se plantea a través de éstos que el Tribunal de Circuito de Apelaciones erró al revocar la determinación del foro de instancia en cuanto a la capacidad económica del alimentante.

No cabe dudas de que, de acuerdo a la norma establecida en Key Nieves v. Oyola Nieves, supra, Ana, quien comenzó sus estudios siendo menor de edad, tiene derecho a que sus alimentantes le provean los medios para terminarlos. Las partes estipularon que no había controversia en cuanto a que la peticionaria era acreedora a recibir el pago de una pensión después de la mayoridad. El Tribunal de Primera Instancia, luego de reconocer que la joven ha demostrado una actitud académica de seriedad, perseverancia y diligencia, determinó que aun si los requisitos jurisprudenciales no hubiesen sido estipulados, de acuerdo a la prueba desfilada la joven era acreedora de dicha ayuda. En cuanto a las necesidades de la peticionaria, el tribunal de instancia hizo un desglose de los gastos pertinentes, para un total de $865.25 mensuales, que no ha sido impugnado.

La controversia principal en el caso de autos es en cuanto a qué parte de la pensión de Ana debe satisfacer Argüello, de acuerdo a sus posibilidades económicas. Según se señaló antes, Argüello testificó en la vista del 17 de noviembre de 1998 que se desempeñaba desde hacía cinco años como agente de seguros y que poseía licencias para venderle pólizas a cinco compañías. En la vista declaró que entre los años 1995 y 1998, tiempo durante el cual trabajó para Transoceanic Life, se le adelantaron salarios de $163,732.50,

---

649 A. 2d 24 (Md Ct. Spec. App. 1994); Bassette v. Bartoulucci, 652 N.E. 623 (Mass. App. Ct. 1995). Torres Peralta, supra, pág. 9.17, nota 29.

para un salario mensual aproximado de $4,548.12. Dejó de trabajar para esa compañía debido a una deuda que contrajo con ésta y durante el año 1998 trabajó para el Puerto Rico Tech Junior College, donde devengó un salario mensual durante cuatro meses de $1,600. Durante los dos meses anteriores a la vista, trabajó como agente de seguros para la compañía PRAICO Life, y alegadamente sólo ganó entre $600 a $700 mensuales.

Los gastos mensuales corrientes de Argüello, **según él mismo testificó**, ascendían a $2,082.00, sin contar con los pagos mensuales que debía hacer a sus tarjetas de crédito y por préstamos bancarios. Además, expresó que pagaba $600 mensuales de pensión a otros tres hijos que vivían en los Estados Unidos.

Con arreglo al importe total de todos los gastos mensuales referidos, el Tribunal de Primera Instancia correctamente le imputó ingresos a Argüello por la cantidad al menos de $3,755 mensuales. Tomó en cuenta que los gastos mensuales que Argüello dijo tener sobrepasaban por mucho el sueldo que decía recibir, **por lo que el tribunal pudo inferir que Argüello no podía estar viviendo sólo con ese sueldo**. Tomó en cuenta, además, la capacidad de Argüello para generar ingresos como agente de seguros, sobre todo el hecho de que Argüello había estado ganándose un promedio de $4,548.12 mensuales durante los últimos tres años.[7] Finalmente, el foro de instancia ponderó el historial evasivo de Argüello respecto al cumplimiento de su obligación a través de los años[8], y la poca credibilidad que presentó Argüello al testificar.[9] En

---

[7] A tales efectos, el tribunal de instancia expresó que no podía descartar la posibilidad de que Argüello se desempeñaba como agente de seguros mientras trabajaba para Puerto Rico Tech Junior College.

[8] Ante el incumplimiento del padre con su responsabilidad, en diciembre de 1992 el tribunal ordenó la retención de ingresos de la que en aquel entonces era la esposa de Argüello, la señora Santiago. En enero de 1993 Argüello y su esposa sometieron una petición de divorcio por consentimiento mutuo. Argüello cedió su porción de la casa ganancial donde vivía el matrimonio a la señora Santiago a título gratuito. Sin embargo, continuó conviviendo con la señora Santiago en esa propiedad luego del divorcio. Además, Argüello solicitó una rebaja de pensión, por no contar con el sueldo de su ex-esposa. Ante esta situación de aparente divorcio colusorio, la madre de Ana, que en aquel entonces era menor de edad, presentó una Acción Civil en Fraude de Acreedores contra Argüello y la señora Santiago que se encuentra pendiente de resolver ante el Tribunal de Primera Instancia.

[9] La Ley de Sustento de Menores, supra, dispone en la sección 510 (b)(4) que:

proporción al ingreso neto mensual de la madre de Ana, que era $4,133, el tribunal le asignó a Argüello la obligación de pagar el 48% de los gastos de su hija.

Debe destacarse que ninguno de los factores que el Tribunal de Primera Instancia tomó en consideración para imputarle ingresos a Argüello fue controvertido ante el Tribunal de Circuito de Apelaciones.[10] Aun así, el foro apelativo determinó que se había establecido mediante prueba testifical que el ingreso mensual de Argüello era de $700, por lo que dicho foro concluyó que éste no estaba en posición económica para afrontar el pago de la pensión que le fue fijada. El Tribunal de Circuito de Apelaciones, sin embargo, no tomó en cuenta que a la referida prueba testifical **el tribunal de instancia no le había dado credibilidad alguna**. Erró, pues, el foro apelativo al resolver como lo hizo.

El tribunal de instancia, luego del testimonio de Argüello sobre sus ingresos actuales, al cual no le dio credibilidad alguna, evidentemente advirtió que se encontraba frente a una situación en la cual no se estaban informando todos los ingresos del alimentante o se estaba reduciendo voluntariamente la capacidad de generar ingresos para evadir la obligación de alimentar, a diferencia de un caso de reducción legítima de ingresos, y consideró los factores que jurisprudencialmente hemos reconocidos como pertinentes al imputar ingresos. El foro de instancia, pues, procedió correctamente a imputarle un ingreso a Argüello. Erró el foro apelativo al no reconocer que en este caso procedía la imputación de ingresos referidos.

Es preciso recordar que es el alimentante, en los casos en que solicita rebaja de pensión, quien tiene el peso de la prueba. López v. Rodríguez, supra;

---

...el administrador podrá imputar a la parte que se negare a descubrir la información dentro del término requerido o no contestare debidamente o con evasivas, el ingreso promedio del oficio, ocupación, profesión del alimentante, según toda la prueba disponible, incluyendo estimados, estudios y proyecciones de ingresos, gastos, estilos de vida y cualquier otra prueba pertinente y continuar con el procedimiento administrativo autorizado por este capítulo, incluyendo hacer una determinación en rebeldía.

[10] Aunque en el recurso de apelación ante el foro apelativo se acompañó copia de la planilla de contribución sobre ingresos de Argüello, fue

Torres Peralta, supra, pág. 2.44. Del expediente no surge prueba alguna que sea contraria a las determinaciones del tribunal de instancia. Sólo constan las mismas alegaciones de Argüello a las que el referido foro no le dio credibilidad. "El juez sentenciador, ante quien deponen los testigos, es quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. Figueroa v. Am. Railroad Co., 64 D.P.R. 335, 336 (1994)." Cuevas Segarra, Tratado de Derecho Civil, Publicaciones JTS, 2000, pág. 685.

Reiteramos una vez más la norma fundamental de nuestro ordenamiento jurídico de que los tribunales apelativos, en ausencia de error, pasión, prejuicio o parcialidad, no deben intervenir con las determinaciones de hecho, la apreciación de la prueba y las adjudicaciones de credibilidad realizadas por los tribunales de instancia. Trinidad García v. Chade, res. el 18 de enero de 2001, 152 D.P.R. ____, 2001 TSPR ___, 2001 JTS 10; Flores v. Soc. de Gananciales, res. el 30 de junio de 1998, 146 D.P.R. ___, 1998 TSPR 96, 98 JTS 96; López Vicil v. ITT Intermedia Inc., 142 D.P.R. 857, 864 (1997); Quiñones López v. Manzano Pozas, 141 D.P.R. 139 (1996); Pueblo v Bonilla Romero, 120 D.P.R. 92 (1987); Vélez v. Srio. de Justicia, 115 D.P.R. 533 (1984); Ortiz v. Cruz Pabón, 103 D.P.R. 939 (1975); Rodríguez v. Concreto Mixto, Inc., 98 D.P.R. 579 (1970). "Recientemente enfatizamos que un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia." (Citas Omitidas) Rolón García y otros v. Charlie Car Rental, Inc., res. el 2 de junio de 1999, 148 D.P.R. ____, 99 TSPR 83, 99 JTS 89. La determinación de credibilidad del tribunal sentenciador "es merecedora de gran deferencia por parte del tribunal apelativo por cuanto es ese juzgador quien, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada ya que

precisamente lo que no se informó en ésta lo que consideró el foro de instancia al fijar la pensión.

él fue quien oyó y vio declarar a los testigos." (Citas omitidas) <u>Pueblo v. Bonilla Romero</u>, <u>supra</u>, pág. 111.

Se desprende claramente de lo anterior que se cometieron los errores señalados por la peticionaria. Las conclusiones de tribunal de instancia, de acuerdo a las determinaciones de hecho a las que llegó luego de desfilada la prueba, son conforme a derecho, ya que incorporan y aplican la normativa sobre el particular que reseñamos antes. El demandado no logró establecer que el foro de instancia hubiese incurrido en error, pasión, prejuicio o parcialidad, por lo que el Tribunal de Circuito de Apelaciones no tenía fundamento válido para intervenir con la apreciación del tribunal sentenciador. Reiteramos que en el caso de autos, Argüello, que fue quien solicitó la rebaja en la pensión alimentaria en cuestión, tenía la obligación de justificar tal solicitud ante el foro de instancia, cosa que no logró hacer.

IV.

Por los fundamentos expresados antes, procede que se deje sin efecto la sentencia dictada por el Tribunal de Circuito de Apelaciones el 14 de febrero de 2000 y se reinstale la del Tribunal de Primera Instancia del 21 de mayo de 1999, mediante la cual se le impuso a Argüello una pensión de $415.32 mensuales a favor de su hija, Ana. Nada de lo aquí dispuesto, claro está, impide que el recurrido pueda acudir de nuevo al foro de instancia para solicitar una rebaja de la pensión cuando pueda demostrar **fehacientemente** que sus circunstancias económicas realmente han cambiado.


JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ana M. Argüello López,
Myrna Y. López Peña

    Demandantes-Recurrentes

       v.                        CC-2000-366      Certiorari

Elías Argüello García

    Demandado-Recurrido

SENTENCIA

San Juan, Puerto Rico, a  31 de agosto de 2001.

        Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente,  se deja sin efecto la sentencia dictada por el Tribunal de Circuito de Apelaciones el 14 de febrero de 2000 y se reinstala la del Tribunal de Primera Instancia del 21 de mayo de 1999, mediante la cual se le impuso a Argüello una pensión de $415.32 mensuales a favor de su hija, Ana. Nada de lo aquí dispuesto, claro está, impide que el recurrido pueda acudir de nuevo al foro de instancia para solicitar una rebaja de la pensión cuando pueda demostrar **fehacientemente** que sus circunstancias económicas realmente han cambiado.

        Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.  El Juez Asociado señor Hernández Denton concurre con la Opinión emitida por entender que la controversia de autos debió ser resuelta mediante una breve Sentencia.  La Opinión del Tribunal en esencia resume la normativa aplicable a este tipo de controversia y no contiene ningún pronunciamiento nuevo que amerite ser publicada como Opinión del Tribunal.  El Juez Asociado señor Rebollo López no interviene.  El Juez Asociado señor Rivera Pérez no intervino.

                      Isabel Llompart Zeno
              Secretaria del Tribunal Supremo